**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES SIMMONS, | ) | CASE NO. 1:19-cv-00745 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | |

Plaintiff, Charles Simmons ("Plaintiff" or "Simmons"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his

applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C.

§§ 416(I), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g)

and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below,

the Commissioner's final decision is AFFIRMED in part, and VACATED AND REMANDED in

part for further consideration consistent with this opinion.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

In October 2014, Simmons  filed an application for POD, DIB, and SSI alleging a disability

onset date of January 2, 2011, and claiming he was disabled.  (Transcript ("Tr.") at 178-185.)  The

applications were denied initially and upon reconsideration, and Simmons requested a hearing before

an administrative law judge ("ALJ").  (*Id*. at 145-46.)

On July 18, 2018, an ALJ held a hearing, during which Simmons, represented by counsel,

and an impartial vocational expert ("VE") testified.  (*Id.*)  At the hearing, Simmons amended the

alleged onset date of disability to October 4, 2016.  (*Id.*)  On October 11, 2018, the ALJ issued a

written decision finding Plaintiff was not disabled.  (*Id.* at 16-26.)  The ALJ' s decision became final

on March 5, 2019, when the Appeals Council declined further review.  (Tr. 1.)

On April 4, 2019, Simmons filed his Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15, 16.)

Simmons asserts the following assignment of error:

> (1)  Whether the ALJ violated the treating physician rule when he discounted
> the evidentiary weight assigned to the medical opinion of Simmons'
> treating physician, Dr. Park.

(Doc. No. 13 at 8.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Simmons was born in March 1977 and was 39 years old at his amended alleged onset date

of disability, making him a "younger" person under Social Security regulations.  (Tr. 24.)  *See* 20

C.F.R. §§ 404.1563 & 416.963.  He received a GED in 2012, and is able to communicate in English.

(*Id.*)  He has past relevant work as a construction laborer and stock clerk.  (*Id.*)

**B.      Relevant Medical Evidence - Physical Impairments[2]**

In January 2011, Simmons hurt his back, fractured his clavicle, fractured his hips, and dislocated his left hip in a car accident.  (Tr. 282.)  Surgery was required to reconstruct his left hip joint.  (*Id.*)  Following the accident, he was hospitalized for three days and then had approximately two weeks of care in an inpatient rehabilitation facility.  (*Id.* at 277, 304.)

His recovery was complicated by traumatic left sciatic neuropathy, which was treated with Lyrica.  (*Id.* at 266.)  An electro diagnostic study from February 2011 showed severe damage to the left peroneal nerve and mild left tibial nerve palsy.  (*Id.*)  The hip fracture caused a left foot drop, which was treated with a brace Simmons wore at night.  (*Id.* at 267.)

By October 2012, Simmons continued to have a "slight limp."  (*Id.* at 533.)  He reported severe pain in his hip, back, and knee, caused by standing too long while working in a kitchen.  (*Id.*)  His treating doctor, Dr. Haas, opined that Simmons had neuropathy resulting from the car accident.  (*Id.* at 560.)  An x-ray of his knee taken in September 2012 showed "mild narrowing of the medial knee compartment," but "no acute abnormality."  (*Id.* at 549.)

Simmons sought treatment for his hip and back pain from the Cleveland Clinic in October 2016.  (*Id.* at 961.)  Dr. Franklin Price ordered new x-rays, which showed post-surgical changes in his left hip, but noted the "hardware appears grossly intact" and Simmons' joints were maintained, with the exception of a "small ossification along the inferior hip joint space."  (*Id.*)  The x-ray of his back showed normal vertebral body heights and spacing, but "tiny marginal osteophytes at multiple

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

thoracic and lumbar levels." (*Id.* at 965.)  Dr. Price prescribed ibuprofen and gabapentin for pain, and baclofen and meloxicam to treat inflammation.  (*Id.* at 994.)

Simmons also sought treatment for migraine headaches from University Hospitals ("UH") in October 2016.  (*Id.* at 971-72.)  He reported to Dr. Hoon Park that sitting hurt his back, but he could not walk long distances due to pain, and his shoulder and back pain were worse when he moved.  (*Id.*)  The physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 973.) Dr. Park prescribed the anti-hypertensive Verapamil.  (*Id.* at 1071.)

Simmons returned to Dr. Price in November 2016 for a follow-up visit, reporting pain in his wrist.  (*Id.* at 986.)  An x-ray of his wrist showed no significant findings.  (*Id.* at 989.)  He returned again in December 2016 complaining of left hip pain.  (*Id.* at 995.)  Dr. Price prescribed Ben-gay ointment.  (*Id.* at 996.)

Simmons returned to Dr. Park in January 2017, reporting pain in the left side of his lower back when he moved his hip, and pain if he walked more than 100 yards.  (*Id.* at 1013.)  He also reported that he continued to get migraines frequently, and his medication was making him drowsy. (*Id.*)  Again, the physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 1015.)  Dr. Park referred him for physical therapy to treat his back and hip pain.  (*Id.* at 1015.)

Simmons began physical therapy at UH in February 2017.  (*Id.* at 1058.)  His evaluation noted that the left side of his pelvis was elevated, his gait was antalgic, with his body mechanics shifting right to protect his left side.  (*Id.* at 1065.)  The physical therapist noted gait deviations, abnormal posture, and pelvic asymmetry, as well as functional limitations affecting sitting, standing, walking, reaching, lifting, squatting, sleeping, and activities of daily living.  (*Id.* at 1066.)

After receiving therapy twice a week during February, Simmons was re-evaluated by the UH physical therapists at the beginning of March 2017. (*Id.* at 1137.) They recommended he continue therapy twice weekly for four more weeks, because his goals were only partially met, and although he had "mild gains" in range of movement, he continued to show significant asymmetry. (*Id.*) His physical therapist recommended a home TENS unit, since he responded well to a trial at physical therapy. (*Id.* at 1131.)

On March 6, 2017, Dr. Park completed a medical source statement for Simmons. (*Id.* at 1181-82.) He opined that Simmons experienced "severe" pain due to his hip and shoulder conditions and cluster migraine headaches that would interfere with his concentration, take him off task, and cause absenteeism. (*Id.*) He further opined that Simmons had the following functional limitations:

- lift 5 pounds occasionally and 2 pounds frequently;

- stand and walk for a total of half an hour in an 8-hour workday;

- sit for a total of one hour in an 8-hour workday;

- rarely climb, stoop, crouch, kneel, crawl, or push/pull;

- occasionally balance and reach;

- need to elevate his legs 45 degrees at will;

- require an average of 7 hours of additional rest breaks per 8-hour day.

(*Id.*)

In April 2017, Simmons received a TENS unit to help with his back pain. (*Id.* at 1125.)

In May 2017, Simmons was again re-evaluated by the UH physical therapy department. (*Id.* at 1120.) They recommended he continue physical therapy weekly for the next 8 weeks. He still had

not received a brace that was ordered, and the assessor noted he continued to have an antalgic gait, with his body mechanics shifted to the right.  (*Id.* at 1121.)

In June 2017, his physical therapist noted that Simmons "significantly compensated for [his] foot drop and hip hike/circumduction, [increasing] strain on his left hip.  (*Id.* at 1117.)

Simmons was discharged from physical therapy in July 2017, after 23 treatment sessions. (*Id.* at 1113.)

In July 2017, Simmons saw Dr. Park again.  (*Id.* at 1180.)  Dr. Park noted that Simmons was wearing his brace all day for left leg stability, and had an "abnormal gait" and "limping."  (*Id.*) However, the physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 1083.)

In September 2017, Simmons saw Dr. Park again.  (*Id.* at 1175.)  Again, the physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 1078.)

In December 2017, Simmons saw Dr. Park again.  (*Id.* at 1199.)  Again, the physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 1202.)

In March 2018, Simmons saw Dr. Park again.  (*Id.* at 1194.)  Dr. Park noted that Simmons was "getting bruises from [his] ankle brace" and "limpimng [sic]."  (*Id.*)  Again, the physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 1097.)

In June 2018, Simmons saw Dr. Park again.  (*Id.* at 1228.)  Dr. Park noted that Simmons was "limping, ankle is the same." (*Id.*)  Again, the physical exam showed "Examination of gait: Normal" and cranial nerves intact. (*Id.* at 1078.)

**C.     State Agency Reports - Physical Impairments**

In January 2017, state agency reviewing physician Leigh Thomas, M.D., opined that Simmons had the following functional limitations:

- occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds;

- stand and/or walk, and sit about 6 hours in an 8-hour workday;

- unlimited pushing and pulling;

- occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; and

- never climb ladders/ropes/scaffold.

(Tr. 74-76.)

In April 2017, state agency reviewing physician Leon Hughes, M.D., concurred with the opinion of Dr. Thomas. (*Id*. at 85-87.)

**D.     Hearing Testimony**

During the July 18, 2018 hearing, Simmons testified to the following:

- He lives with his Grandmother in East Cleveland. (*Id*. at 40.)

- He is 5 feet 10 inches tall and weighs 245 pounds. His weight fluctuates. (*Id*.)

- He is right handed. (*Id*.)

- He is single. (*Id*.)

- He does not have a driver's license. He gets rides from family members or his girlfriend. (*Id*. at 41.)

- His grandmother cooks for him and helps with things like drawing his bath. (*Id*. at 42.)

- He attended school through the 12th grade, but didn't graduate. He received his GED in 2012. (*Id*.)

- Before his car accident in 2011, he worked as a laborer at Form Tech, making forms for pouring concrete. In that job, he was on his feet all the time, and lifted up to 200 pounds. (*Id*. at 42-43.)

- From 2005-2007, he worked full-time at JC Penney doing stock replenishing, which required him to stand for five hours of an eight-hour day, and lift packages up to 50 pounds. (*Id*. at 44-45.)

- His pain limits him in both sitting and standing, and he gets "cluster migraines" which require him to go to somewhere silent and dark to try to relieve the pain. (*Id*. at 45.)

- On an average day, he experiences about 16 hours of pain in his left hip, and his lower back. The pain comes and goes. (*Id*. at 46.)

- He can sit or stand comfortably for about 15 minutes. (*Id*. at 47.)

- He can walk between 150 and 200 feet before he needs to rest or take a break. (*Id*. at 48.)

- He doesn't know exactly how much he can lift, but estimates that up to five pounds "would be cool." (*Id*.)

- His pain is aggravated by the weather, and also by certain movements, such as pivoting. (*Id*. at 48-49.)

- His migraines occur about every other day. If he takes his medication and goes to a dark room quickly, they typically pass within an hour and a half to two hours. (*Id*. at 50.)

- His grandmother and cousin do the household chores and cook his meals. (*Id*. at 50-51.)

- He sets out his grandmother's cereal, and makes coffee in the morning. (*Id*. at 51.)

- His medications make him drowsy. (*Id*.)

- His TENS unit numbs his pain. He uses it often at night, and when he knows he will be out. (*Id*. at 53.)

- He cannot set his left wrist flat on the table because it causes a shooting pain. (*Id*.)

- He wears a brace on his left leg because of nerve damage caused by the car accident which broke his hip. (*Id*. at 54.)

- He takes about four naps a day because of drowsiness resulting from his medication, each lasting between 30 minutes and an hour. (*Id*. at 55.)

- His migraines began after he was in the car accident. (*Id*. at 58.)

The VE testified Simmons had past work as a construction laborer and stock clerk. (*Id*. at 59.) The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual with the Claimant's age and education with the past two positions that you've described. Further assume that the hypothetical individual is limited as follows: to light, occasional climbing of ramps and stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch, crawl. First, could that hypothetical individual perform either past positions you've described?

(*Id.* at 59-60.) The VE testified the hypothetical individual would not be able to perform Simmons' past work as construction laborer and stock clerk. (*Id*. at 60.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as an inspector and hand packager, electronics worker, or storage facility rental clerk. (*Id*. at 60.)

The ALJ then posed a second hypothetical question:

> [A]ssume the same limitations I described in Hypothetical #1 that I'm modifying but building upon it as follows: Occasional balance; never to be exposed to unprotected heights; moving mechanical parts or operate a motor vehicle, could that hypothetical individual perform any work?

(*Id*.) The VE explained the hypothetical individual would still be able to perform the three jobs he previously identified. (*Id*. at 61.)

The ALJ then posed a third hypothetical question:

> [A]ssume the same limitations I described in Hypothetical #2 and now adding to it frequent left foot controls, could that hypothetical individual perform any work?

(*Id*. at 61.)  The VE explained the hypothetical individual would still be able to perform the three

jobs he previously identified.  (*Id*.)

The ALJ then posed a fourth hypothetical question:

[I]f I were to modify Hypotheticals 1, 2 and 3 as follows: That the hypothetical
person can work in . . . up to and including a loud noise environment, could that
hypothetical individual perform any work?

(*Id*.)  The VE explained the hypothetical individual would still be able to perform the three jobs he

previously identified.  (*Id*.)

The ALJ then posed a fifth hypothetical question:

[I]f I were to modify Hypotheticals 1, 2, 3 and 4 as follows: To include frequent ...
left handling and fingering, could that hypothetical individual perform any work?

(*Id*.)  The VE explained the hypothetical individual would still be able to perform the three jobs he

previously identified.  (*Id*.)

The ALJ then posed a sixth hypothetical question:

[I]f I were to modify Hypotheticals 1 through 5 as follows: To sedentary, could that
hypothetical individual perform any work?

(*Id*. at 61-62.)  The VE explained the hypothetical individual would be able to perform the jobs of

document preparer, patcher, or touch-up screener.  (*Id*. at 62.)

The ALJ then posed a seventh hypothetical question:

[I]f I were add to any of my earliers the following: That the hypothetical individual
in addition to normal work breaks would be off task more that 20 percent of an eight-
hour work shift and are absent from work more than two days per month, how does
that impact her early responses?

(*Id*.)  The VE explained the both of those were beyond acceptable tolerances, and would preclude

employment.  (*Id*. at 62-63.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

11

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.15609(c), *and* 416.920(g).

Here, Simmons was not insured on his amended alleged disability onset date, October 2016, because his date last insured ("DLI") was December 31, 2015. (Tr. 16, 39.) Therefore, by amending his alleged disability onset date, Simmons effectively withdrew his claims to DIB and POD. The Court will consider his assignment of error as it applies to his remaining claim for SSI.

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in subsequent gainful activity since January 2, 2011, the alleged onset date.

3.    The claimant has the following severe impairments: remote postoperative changes of the left acetabulum with severe left peroneal nerve palsy and mild left tibial nerve palsy; minimal degenerative changes of the lumbar spine; migraines; essential hypertension; and obesity.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

12

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to do light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can frequently operate left foot controls. He can occasionally climb ramps and stairs. He can never climb ladders, ropes or scaffolds. He can occasionally balance, stoop, kneel, crouch and crawl. He can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle. He is able to work in (up to an [sic] including) a loud noise environment.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born March **, 1977 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 2, 2011, through the date of this decision.

(Tr. 19-25) (citations omitted).

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572

F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v.*

*Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11  13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10  cv  734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10  CV  017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09  cv  1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Simmons alleges that the ALJ violated the treating physician rule when he discounted the evidentiary weight assigned to the medical opinion of Simmons' treating physician, Dr. Park.  (Doc. No. 13 at 8-10.)   He argues that the ALJ "cherry picked" portions of the medical record that were "clearly inaccurate," and should have relied instead on conflicting statements in the record that evinced greater impairment.  (*Id.* at 9.)

The Commissioner responds that the ALJ appropriately assigned "little" weight to Dr. Park's opinion because it conflicted with some of his own treatment notes, as well as the conservative course of treatment that Simmons received and "benign" imaging results.  (Doc. No.

15 at 7-8.) The Commissioner further asserts that Simmons bore the responsibility for getting clarification regarding the conflicting records from Dr. Park, or otherwise demonstrating the extent of his disabling limitations. (*Id.* at 9.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[3] However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[4] Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5] *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[4] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

[5] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Both parties acknowledge that Dr. Park qualifies as a treating physician under Social Security regulations. He saw Simmons multiple times as his primary care physician, beginning in October 2016.[6] (Tr. 971.) The ALJ's Opinion explained his decision to accord Dr. Park's March 6, 2016 opinion "little weight" as follows:

> In this case, upon consideration of the evidence, the undersigned finds that Dr. Park's opinion is unsupported and inconsistent with the record as a whole. Specifically, the undersigned gave little weight to Dr. Park's opinion. Although Dr. Park is the claimant's primary care physician and had the opportunity to treat the claimant on several occasions, his opinion is not supported by the record and appears to be based on claimant's subjective complaints. The claimant's gait was normal and he had no focal neurological deficits per Dr. Park's own treatment notes.

---

[6] Additional visits are documented in November 2016, January 2017, February 2017, March 2017, July 2017, September 2017, December 2017, March 2018, and June 2018. (Tr. 1019, 1013, 1016, 1180, 1175, 1199, 1194, 1228.)

(*Id.* at 23.)[7]

Simmons argues that the "Examination of gait: normal" notation must be the result of a default setting in the electronic medical record, since it appears even when it contradicts Dr. Park's hand-typed notes. (Doc. No. 16 at 2.) He points out this notation appears in the record of visits which also indicate severe back and hip impairments that would presumably affect his gait. (*Id.*) For example, it appears in records of visits:

- at which Dr. Park referred Simmons to physical therapy for back pain and left hip pain (Tr. 1015);

- during the period that Simmons was receiving physical therapy (*Id.* at 1180, 1175, 1199);

- which diagnose "back pain" and "neuropathic pain" and prescribe medications including Meloxicam, Baclofen and Gabapentin to treat these ailments (*Id.* at 1090, 1098, 1184, 1231);

- which discuss the need to have an ankle brace adjusted, because it is causing bruising (*Id.* at 1216); and

- which recommend back exercise and stretching to relieve back pain. (*Id.* at 1231.)

Simmons' theory about the default setting on UH's electronic medical records is unsupported by any evidence, as the Commissioner explains. (Doc. No. 15 at 8.) However, as the ALJ's opinion makes clear, there is a significant amount of other evidence in the record that Simmons' gait was impaired. (Tr. 21-23.) The ALJ recites, but does not discuss, the following medical evidence:

---

[7] According to the U.S. National Library of Medicine, a "focal neurologic deficit" is "A focal neurologic deficit is a problem with nerve, spinal cord, or brain function. It affects a specific location, such as the left side of the face, right arm, or even a small area such as the tongue. Speech, vision, and hearing problems are also considered focal neurological deficits." Medline Plus Medical Encyclopedia, last updated Dec. 2, 2019, https://medlineplus.gov/ency/article/003191.htm

- On February 25, 2011, electromyogram testing showed electrodiagnostic evidence for a severe left peroneal nerve palsy, primary axonal type with abundant signs of denervation and the absence of voluntary recruitment (Ex 2F/6). There is near complete injury. There is evidence of a mild left tibial nerve pasly with active signs of denervation.

- X-rays of the left knee on September 6, 2012 showed a mild narrowing of the medial knee compartment (Ex. 3F/73). X-rays of the pelvis and left lateral hip showed metallic plates and screws in the left acetabulum from a previous internal fixation of a fracture (Ex. 3F/74.)

- On October 3, 2016, the claimant treated with Franklin B. Price, M.D. and complained of pain (Ex 5F/3). . . . X-rays of the claimant's bilateral hips showed post-surgical changes of the remote left acetubular fracture fixation with plate and screw devices (Ex 6F/9). The hardware was grossly intact. There was small ossification along the inferior hip joint space that may relate to remote trauma.

- On October 20, 2016, Hoon Park, M.D. treated the claimant who resported that he was in a serious motor vehicle accident in 2011, and did not move much during his five years in prison where he was weaned off narcotics (Ex. 7F/5). Sitting hurt his back and he could not walk distances due to pain. His shoulder and back pain were worse when moving. He reported feeling tired (Ex. 7F/6). His blood pressure was 140/100.

- The claimant treated with primary care physician Franklin B. Price, M.D. on January 6, 2017 for medication refills (Ex 9F/4). Dr. Price prescribed Meloxicam, Gabapentin, Ibuprofen, and Baclofen (Ex 9F/5).

- Dr. Park treated the claimant on January 23, 2017 and complained of lower back pain after moving his hip (Ex 10F/5). He complained of worsening sharp pain. He could walk up to 100 yards before he had pain. He complained of migraines.

- The claimant began physical therapy in February 2017 for his pain (Ex 12F/3). She [sic] completed physical therapy on July 26, 2017 for her [sic] back and hip pain (Ex 15F/3). A mild improvement in gait was reported (Ex 15F/5).[8]

(*Id.* at 21-22.) As the ALJ notes, by the end of Simmons' physical therapy sessions, "a mild

---

[8] Although the ALJ's opinion limits discussion of Simmons' six months of physical therapy to two sentences in his report, it is documented by approximately 80 pages of treatment records, which clearly document mobility impairment resulting from Simmons' back and hip pain. (Tr. 1058-78; 1111-49; 1153-70.)

improvement in gait was reported." (*Id.* at 22.) Further, the physical therapy records document that left side of his pelvis was elevated, and his gait was antalgic, with his body mechanics shifting right to protect his left side. (*Id.* at 1065.) This is consistent with treatment records following his January 2011 car accident, and subsequent reconstructive hip surgery, and inconsistent with the ALJ's assertion that the record offered only self-reported, subjective evidence that Simmons' gait was impaired. Simmons' was also prescribed and received a TENS unit as well as a leg brace to treat his back and leg pain and improve his functioning. (*Id.* at 1125, 1180.)

The Commissioner points out that conflicting evidence is common in disability cases. (Doc. No. 15 at 5.) This is true, as is the assertion that the ALJ has the responsibility for resolving those conflicts. *Solembrino v. Astrue*, No. 1:10-CV-01017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011) ("It is not uncommon in disability cases for there to be some inconsistencies in the record. It is the duty of the ALJ to resolve any inconsistencies in the evidence.") Simply reciting conflicting evidence, however, does not satisfy this duty, because unless the ALJ builds a bridge between the evidence and his conclusions, the Court cannot meaningfully review them. The ALJ supports his decision here with a bare statement that statement that Dr. Park's opinion is "unsupported and inconsistent with the record as a whole . . . .and appears to be based on the claimant's subjective complaints." (Tr. 23.) *See Fleischer*, 774 F. Supp. 2d at 877 ("Even if there is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted by* 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010), *report and recommendation*

*adopted by* 2010 WL 2929550 (N.D. Ohio July 27, 2010). Yet the evidence the ALJ recited makes it clear that the record itself is inconsistent. Given the internal contradictions in Dr. Park's records, it would be impossible to produce an opinion that was consistent with the record "as a whole." In this situation, the Commissioner has discretion to weigh the evidence - and, indeed, the duty to resolve conflicting evidence - and he must do so in a way that is sufficiently specific that subsequent reviewers, such as the Court, can understand the reasons for that weight. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). Further, he cannot deal with contradictory evidence by overlooking its existence. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Smith v. Comm'r of Soc. Sec.*, No. 1:11 CV 2313, 2013 WL 943874 at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that point to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783 at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The Commissioner argues that the ALJ's subsequent statement that "The claimant's gait was normal and he had no focal neurological deficits per Dr. Park's own treatment notes" is an explanation that he discounted Dr. Park's opinion for the good reason that it inconsistent with the record. (Doc. No 15 at 8, citing Tr. 23.) However, the ALJ does not explain why he did not give credence to the other parts of Dr. Park's notes - and other records - that do support his opinion.

Instead, he deems the opinion "unsupported," suggesting that he was ignoring or overlooking those records. (Tr. 23.) This Court has no way of knowing why Dr. Park's records consistently contain the notation "Examination of gait: normal," even when other information in same the records suggests an impaired gait.[9] However, the notation, by itself, does not constitute "substantial evidence" to give little weight to Dr. Park's opinion, given the plethora of other clinical and subjective evidence which support his findings. An explanation of the ALJ's analysis is especially important where, as here, the ALJ seems to deny the existence of the very evidence he recited only paragraphs before by saying the opinion "is not supported by the record." *Id.*; *See, e.g., Fuston v. Comm'r of Soc. Sec.*, No. 1:11CV224, 2012 WL 1413097 (S.D. Ohio Apr. 23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported), *report and recommendation adopted*, 2012 WL 1831578 (S.D. Ohio May 18, 2012). The ALJ has the duty to resolve the conflicts in the evidence, and to build an accurate and logical bridge between that evidence and his conclusion. In this case, his opinion does not enable this Court to determine whether he appropriately weighed that contradictory evidence, since his analysis of Dr. Park's opinion does not acknowledge it, even though he recited it earlier in his opinion.

The Commissioner offers additional good reasons why Dr. Park's opinion was accorded little weight. First, he asserts that Dr. Park's "outlying opinions were inconsistent with [Simmons'] benign imaging and conservative treatment." (Doc. No. 15 at 8.) Next, he asserts that because the descriptions of Simmons' limping or abnormal gait occur in the "History of Present Illness" section

---

[9] Neither party nor the ALJ articulated a clear argument about the significance of focal neurological deficits in this case.

of Dr. Park's records, they represent Simmons' subjective report of his symptoms, and not Dr. Park's own observations. In contrast, he asserts that the notation "Examination of gait: normal" that appears in identical wording in the "Physical Exam" section of many UH records is objective medical data, and therefore entitled to greater weight. (*Id.* at 8-9.) The ALJ, however, did not provide these explanations for discounting Dr. Park's opinion.[10] It is well established the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin,* No. 5:12CV2355, 2013 WL 3967282 at *8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin,* No. 1:12CV909, 2013 WL 3791439 at *6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue,* No. 1:10 CV 02936, 2012 WL 253320 at *5 (N.D. Ohio Jan. 26, 2012). Here, the ALJ did not discount Dr. Park's opinion based on the imaging results, the treatment he received, or the section of the record in which he made his notations and, thus, this Court cannot consider those *post hoc* rationales on appeal. *See Schultz v. Comm'r of Soc. Sec.*, No. 15-12473, 2016 WL 4577049 at *6 (E.D. Mich. Aug. 10, 2016), *report and recommendation adopted by* 2016 WL 4538366 (E.D. Mich. Aug. 31, 2016) ("But Defendant's *post-hoc* rationalization of the ALJ's assessment of Drs. Kazmers and Rao's opinions does not cure the ALJ's failure to provide good reasons."); *Johnson v. Comm'r of Soc. Sec.,* 193 F. Supp. 3d 836, 847 (N.D. Ohio 2016) ("[T]he Commissioner's *post hoc* rationalization for discounting Dr. Smarty's

---

[10] In making the argument that Dr. Park's opinion is inconsistent with benign imaging and conservative treatment, the Commissioner cites to the page of the opinion where the ALJ simply recites medical evidence, much of it quoted *infra*. (Doc. No. 15 at 8, citing Tr. 22.) In making the argument that differentiates sections of the medical records, the Commissioner cites to the Claimant's brief. (*Id.*)

opinion is contrary to the law of Sixth Circuit. While. . . there are portions of Dr. Smarty's treatment notes showing that Plaintiff's condition had improved and was, in some respects, normal. . . , the ALJ did not cite this evidence as a basis for rejecting Dr. Smarty's opinion. Rather, this explanation appears for the first time in the briefing now before the Court. This Court 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'") (quoting *Berryhill v. Shalala*, 4 F.3d 993 (6th Cir. 1993)).

Accordingly, the Court finds the ALJ's explanation for rejecting Dr. Park's opinion does not constitute a "good reason" for purposes of social security regulations. The Court finds a remand is necessary, to affording the ALJ the opportunity to properly address the conflicting evidence in the record and the specific limitations proposed by Dr. Park therein.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED in part and VACATED in part. The denial of Simmons' claims for POD and DIB is AFFIRMED, as those claims were waived when Simmons' amended the alleged date of onset of his disability, and this matter is REMANDED for further consideration of Simmon's claim for SSI, consistent with this opinion.

**IT IS SO ORDERED.**

 *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 6, 2020